# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

ZORANA ALEKSIC and STEVEN
SCHALLER,

   Plaintiffs,

 v.

CLARITY SERVICES, INC.,

   Defendant.

)
)
)
)
)
)
)
)
)
)
)

Case No: 1:13-cv-07802

Judge Ronald A. Guzmán

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, Clarity's motion for summary judgment [130] is granted.

Plaintiff's motion to strike the expert testimony of Joel Winston [140] is granted, and Clarity's

motion to strike the expert testimony of Margot Saunders [152] is stricken as moot. Clarity's

motion to strike Plaintiff's statement of additional facts [156] is denied. Civil case terminated.

## STATEMENT

Zorana Aleksic and Steven Schaller ("Plaintiffs") bring this suit against Clarity Services,

Inc. ("Clarity"), claiming violations of the Fair Credit Reporting Act ("FCRA").[1] (Second Am.

Compl., Dkt. # 76.) While the suit was pled as a class action, the Court denied Plaintiff's motion

for class certification on December 2, 2015, and the case proceeded only as to the two named

Plaintiffs. (Dkt. # 123.) This matter is before the Court on Plaintiffs' Motion to Strike Expert

Testimony filed on March 20, 2015, (Pls.' Mot. Strike, Dkt. # 140), Clarity's Motion to Strike

Expert Testimony filed April 13, 2015, (Def.'s Mot. Strike, Dkt. # 152), Clarity's Motion to

Strike Plaintiff's Additional Material Facts filed April 13, 2015, (Def.'s Mot. Strike Facts, Dkt. #

---

[1] The suit originally named Experian Information Solutions, Inc. as an additional defendant, but the Court dismissed Experian with prejudice on August 4, 2014. (Dkt. # 101.)

156), and Clarity's Motion for Summary Judgment filed December February 17, 2015 (Mot. Summ. J., Dkt. # 130).

## Facts

The record reflects no material dispute as to any of the facts below.[2]

Clarity is a Florida corporation that provides various credit reporting services and qualifies as a credit reporting agency for FCRA purposes. (Def.'s Stmt. Fact, Dkt. # 131, ¶ 2.) The specific credit service implicated in this suit is Clarity's "Clear ID Fraud" fraud detection service, which Clarity offers customers for a fee. (Pls.' Stmt. Fact, Dkt. # 146, ¶ 16.) This service is intended to help the lenders that are Clarity's customers avoid loan defaults by identifying any red flags that indicate a particular loan application is likely to be fraudulent. (Def.'s Stmt. Fact, Dkt. # 131, ¶ 20; Def.'s Ex. F, Dkt. # 128-7, ¶ 27.)

The "Clear ID Fraud" service works as follows. Individuals fill out applications with their personal information in order to apply for loans from various lenders. The lender then transmits the applicant's identifying information from the loan application to Clarity, and Clarity compares it to the consumer information files maintained by Experian Information Solutions, Inc., a credit reporting agency. (Def.'s Stmt. Fact, Dkt. # 131, ¶ 17.) Clarity then sends the same identifying information back to the lender, along with a score indicating whether the application presents a high likelihood of fraud based on how well the information provided by the lender matches Experian's consumer files. (*Id*.) Clarity thus verifies the applicant's identifying information already provided by the lender and does not send back any additional identifying information, though it does provide "reason codes" for its fraud risk estimate. (*Id*.; Pls.' Resp. Stmt. Fact, Dkt.

---

[2] Because the Court grants summary judgment for Clarity based solely on the dispositive issue of Plaintiffs' failure to show entitlement to any relief, the majority of the factual allegations made by the parties are not recited here. Only those facts relevant to the dispositive questions of damages causation and willfulness are included.

# 146, ¶ 17.) These reason codes include statements such as "primary account recently overdrawn" or "limited credit experience." (Pls.' Ex. 2, Dkt. # 150 at 107-08.) Clarity is not part of the loan application process and never interacts with the loan applicant, and therefore has no way of knowing whether the loan applicant actually is who he or she purports to be. (Def.'s Stmt. Fact, Dkt. # 131, ¶ 19.)

Plaintiffs are individuals residing in this district, who claim that Clarity violated the FCRA by giving their consumer information to its customers via the Clear ID Fraud service. (*Id.*, ¶¶ 1, 5.) The specific Clarity customers at issue are: Mambo Cash, Great Plains Lending, Red Rock Tribal Lending LLC, CIA W T3 Leads Night, Cashweb USA, Lead Express, Payday Max Ltd., Vivus Servicing Ltd., Green Trust Cash, RP Capital LLC, and Blue Novis, Inc. (collectively, the "Named Lenders"). (*Id.*, ¶ 7.) The Named Lenders are all in the business of lending money online, and some also act as "lead generators" that act as middlemen and provide information on prospective applicants to other lenders. (Pls.' Stmt. Fact, Dkt. # 146, ¶ 34.) Seven of the twelve Named Lenders are tribal lending entities affiliated with recognized Native American tribes. (Def.'s Stmt. Fact, Dkt. # 131, ¶ 28.) Plaintiffs have pointed to evidence available on the internet that many of the Named Lenders are subject to cease and desist orders by some state governments, are on some states' lists of illegal lenders, are organized offshore, are poorly rated by the Better Business Bureau, or otherwise have poor reputations. (Pls.' Stmt. Fact, Dkt. # 146, ¶¶ 24-30.)

Between October 11 and October 15, 2012, seven of the Named Lenders submitted Zorana Aleksic's personal identifying information to Clarity through the Clear ID Fraud service, and Clarity verified this information. (Second Am. Compl., Dkt. # 76, ¶ 8; Pls.' Resp. Stmt. Fact, Dkt. # 146, ¶ 15.) All the information the Named Lenders provided was accurate. (Def.'s Stmt.

Fact, Dkt. # 131, ¶ 55.) Similarly, on January 28, 2013, seven of the Named Lenders requested and received Steven Schaller's consumer information through Clarity. (Second Am. Compl., Dkt. # 76, ¶ 13; Pls.' Resp. Stmt. Fact, Dkt. # 146, ¶ 15.) In reality, neither Plaintiff had applied for loans with the Named Lenders; Plaintiffs stated in their deposition testimony that they believe they were the victims of identity theft or of a "phantom loan scam."[3] (Def.'s Stmt. Fact, Dkt. # 131, ¶ 44.) Clarity's response to these requests did not include any new pieces of Plaintiffs' personal information, instead comparing the information already provided by the Named Lenders to the Experian information. (*Id.*, ¶ 15; Def.'s Ex. E, Dkt. # 128-6, ¶ 6.) Clarity's responses did, however, verify sensitive information that the Named Lenders had already provided in the requests (such as birth dates and social security numbers) and provided reason codes containing information on Plaintiffs' credit histories. (Pls.' Ex. 2, Dkt. # 150 at 107-10.) With regard to Plaintiff Aleksic, Clarity's Clear ID Fraud service determined that the likelihood of fraud was high and reported this to the Named Lenders who had requested the fraud check; none of the lenders made a loan to the applicant using Aleksic's name. (Def.'s Stmt. Fact, Dkt. # 131, ¶ 24.) Similarly, Clarity also reported that the application bearing Plaintiff Schaller's name presented a high risk of fraud, though two of the Named Lenders nonetheless made loans on that application. (*Id.*, ¶ 25.) The Plaintiffs had no relationship with the Named Lenders, and did not authorize the Named Lenders to seek their credit reports. (Second Am. Compl., Dkt. # 76, ¶¶ 10-11, 17-18.)

After the credit pulls by the Named Lenders, Plaintiffs began receiving phone calls demanding payment on loans that Plaintiffs never took out and threatening various collection actions. (Def.'s Ex. B, Dkt. # 128-3, at 116-17; Def.'s Ex. C, Dkt. # 128-4, at 94-96.) The calls

---

[3] A phantom loan scam involves an entity learning personal information on a consumer, typically a consumer who has applied for short-term payday loans in the past. The entity then uses this information to contact the consumer and demands payment on a nonexistent debt, "bullying" the frightened consumer into paying money to settle debts that he or she does not actually owe. (Pls.' Ex. A, Dkt. # 145-1, at 9-10.)

came from a blocked number, and when Schaller attempted to call the phone number the callers left in their message, the people he spoke with did not identify themselves. (Def.'s Ex. C, Dkt. # 128-4, at 95.) Schaller did not receive collection calls or any other communications from either of the two Named Lenders who made loans to an applicant using his name. (Def.'s Stmt. Fact, Dkt. # 131, ¶ 47.) Schaller initially believed that the phone calls he received were caused by a lender called Speedy Cash, and added a note to his credit report that reads "Damage to me by Speedy." (Def.'s Ex. L, Dkt. # 128-13.) Clarity never furnished either Plaintiffs' information to Speedy Cash, which is not among the Named Lenders. (Def.'s Stmt. Fact, Dkt. # 131, ¶ 46.) None of the collection calls Aleksic received made mention of any of the Named Lenders, and Aleksic did not retain recordings of these calls or any other evidence of them. (*Id*., ¶¶ 48-49.) The only damages Aleksic alleges are emotional distress, including trouble sleeping and concentrating for a few months due to the stress of receiving the collection calls. (*Id*., ¶ 51.) She went to a doctor for sleeping pills to deal with the stress, which she took for one month. (Def.'s Ex. B, Dkt. # 128-3, at 116.) Schaller also suffered stress and loss of sleep (plus headaches and weight loss) based on these events, but has not sought treatment for any of these symptoms. (Pls.' Ex. 9, Dkt. # 150 at ¶ 22.) Schaller also claims to have spent $301.00 and 378 hours of his time taking steps to protect his identity. (*Id*.) In October 2013, Plaintiffs brought this action asserting that Clarity violated the FCRA by providing Plaintiffs' credit report to the Named Lenders without a permissible purpose for doing so.


**<u>Summary Judgment Standard</u>**

A district court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of

law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether a genuine dispute exists as to any material fact, a court must view all the evidence and draw all reasonable inferences in favor of the non-moving party. *See Weber v. Univ. Research Assoc., Inc*., 621 F.3d 589, 592 (7th Cir. 2010). It is not appropriate for the court to judge the credibility of the witnesses or evaluate the weight of the evidence; the only question on summary judgment is "whether there is a genuine issue of fact." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009). Summary judgment is appropriate only if the record, taken as a whole, establishes that no reasonable jury could find for the non-moving party. *See Sarver v. Experian Info. Solutions*, 390 F.3d 969, 970 (7th Cir. 2004).

**Discussion**

<u>MOTIONS TO STRIKE</u>

Before reaching the merits of Plaintiffs' claims, it is first necessary to resolve three motions to strike that the parties have filed in connection with the summary judgment briefing.

*Clarity's Motion to Strike Plaintiff's Statement of Additional Facts*

Clarity has moved to strike Plaintiffs' statement of additional facts on the ground that it improperly circumvents Local Rule 56.1's 40-paragraph limitation by lumping together several separate statements of fact into each numbered paragraph. (Def.'s Mot. Strike Facts, Dkt. # 156.) The Court indicated that it would take Clarity's motion under advisement, though this did not stop either party from subsequently filing additional lengthy briefs on the matter.

The Court agrees that Plaintiffs have violated the limitations of Local Rule 56.1, and some form of sanction would unquestionably be appropriate in this case. *See Maclin v. A.M. Bus*

*Co., Inc.*, No. 04 C 4176, 2006 WL 463370, at *2 (N.D. Ill. Feb. 22, 2006) (striking a party's Local Rule 56.1 statement with the admonishment that "[t]he compounding of facts into an agglomerated paragraph is not permissible"). The majority of Plaintiff's paragraphs consist of multiple sentences which each make independent factual assertions and each cite to different parts of the record; such sentences should properly be separated into different paragraphs. Plaintiffs defend themselves by noting that Local Rule 56.1 requires only that each of the 40 paragraphs be "short," and citing to *Benuzzi v. Board of Education of the City of Chicago*, 647 F.3d 652 (7th Cir. 2011), for the proposition that shortness is a nebulous standard open to interpretation.

In *Benuzzi*, however, the Seventh Circuit explicitly approved of district courts strictly enforcing their expectations regarding the length of paragraphs, and did not hold it an abuse of discretion for the district court to have stricken portions of the fact statement at issue. 647 F.3d at 655. Moreover, the court acknowledged that some of the paragraphs at issue in that case were "objectively not short," noting that "most people would probably agree that an eighteen-line paragraph is not a short paragraph." *Id.* Paragraph 27 of Plaintiff's statement of additional facts consists of *twenty three* lines, and several others fall within what the Seventh Circuit recognized as the "objectively not short" range. As Clarity notes, a paragraph that alleges twelve independent facts and cites to seven exhibits in the record plus two websites not in the record – as Paragraph 27 does – requires the opposing party to spend an inordinate amount of time deciding whether to admit or deny the matter alleged in the paragraph. This is precisely the sort of obfuscation that Local Rule 56.1 was drafted to prevent.

Nonetheless, it would be unduly harsh to strike portions of Plaintiffs' fact statement without first offering a chance to remedy the problem, and permitting Plaintiffs to file a new

statement at this juncture would unduly delay the resolution of this case. Accordingly, the Court will consider Plaintiffs' statement of additional facts in its entirety, though Plaintiffs' counsel is admonished to follow Local Rule 56.1 in any future matters before the Court.

*Plaintiffs' Motion to Strike Expert Testimony*

Plaintiffs have moved to strike the declaration of Clarity's expert witness, Joel Winston, on the grounds that the declaration consists "almost entirely of purported expert opinions about the ultimate legal issues in this case." (Pls.' Mem. Supp. Mot. Strike, Dkt. # 144, at 1.) For the reasons below, the Court agrees and strikes Winston's declaration in its entirety.

Under the Federal Rules, a witness whose knowledge, skill, experience, training, or education qualifies him or her as an expert may offer opinion testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. For expert testimony to be admissible under Rule 702, the proponent of the testimony must show that it is reliable and would assist the trier of fact in understanding the evidence at issue in the case. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-91 (1993). Because "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system," rejection of expert testimony by the trial court is the exception rather than the rule. Fed. R. Evid. 702 Advisory Committee's Note. The question of whether the expert's conclusions are correct is a "factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based." *Smith v. Ford Motor Co*., 215 F.3d 713, 719 (7th Cir.

2000). Nonetheless, the Seventh Circuit has made clear that "expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (affirming a district court's rejection of purported expert testimony, where that testimony "was largely on purely legal matters and made up solely of legal conclusions, such as conclusions that the [defendant's] actions violated the FHAA"). After a careful review of Winston's declaration, the Court can discern not a single point that constitutes valid and admissible expert testimony.

The bulk of Winston's testimony is a textbook example of the sort of legal interpretations and conclusions that are inadmissible under Rule 702. The section of Winston's declaration that summarizes the opinions he will offer at trial includes such statements as "Clarity complied with the FCRA," "[n]othing in the FCRA obligates a CRA [credit reporting agency] to investigate whether the user has all required licenses," "Clarity had 'reason to believe' the Named Lenders to which Clarity sold the reports had a permissible purpose," "Clarity had reasonable procedures to verify the identities of the Named Lenders," "[e]ven if Clarity violated the FCRA as alleged by plaintiffs, any such violations were not willful as that term has been defined by the Supreme Court," and "[i]n the case of tribal lenders, the law is quite clear that those that are Native American tribes or arms of a tribe are immune from state usury and licensing laws." (Def.'s Ex. M, Dkt. # 128-14, at ¶¶ 17(a)-(f), 36.) Winston also testified that he does "not believe that Congress intended the FCRA to force a CRA" to implement various listed procedures, and opined that Plaintiff's claims and arguments were "without merit" and were based on "unproven allegations and innuendo." (*Id.* at ¶¶ 31, 35, 39.)

Clarity defends this testimony by insisting that it is "not about statutory interpretation, but is about the facts at issue in the present case that support conclusions of compliance with the

statute." (Def.'s Mem. Opp'n Mot. Strike, Dkt. # 155, at 7.) Such a characterization borders on the ridiculous, especially given that Winston at no point explains how any of his unquestionably *legal* conclusions are supported by facts; he lists various documents and Clarity's business practices elsewhere in the declaration, but makes no effort to explain which facts would support which conclusions and why. His statements concern Clarity's obligations under the FCRA and whether it violated those obligations, including whether its procedures were reasonable and whether any violation was willful. Purported expert testimony on these points is inherently unhelpful, as it "does little more than tell the jury what result to reach." *Dahlin v. Evangelical Child & Family Agency*, No. 01 C 1182, 2002 WL 31834881, at *3, (N.D. Ill. Dec. 18, 2002) (quoting *Woods v. Lecureux*, 110 F.3d 1215, 1221 (6th Cir. 1997)). Similarly, what Congress' intent was in passing the FCRA and what the language in it means are legal issues and properly decided by the judge, not expert witnesses. *See Panter v. Marshall Field & Co.*, 646 F.2d 271, 293 n. 6 (7th Cir. 1981) (holding that "it is not for witnesses to instruct the jury as to applicable principles of law, but the judge").

The only other testimony of note in Winston's declaration relates to the meaning of the Federal Trade Commission's "40 years of Experience with the Fair Credit Reporting Act" staff report and the FTC's unrelated consent judgment with ChoicePoint. With regard to the staff report, Winston testifies that the procedures recommended in the report are merely examples of reasonable procedures for credit reporting agencies to take and were not intended as requirements, that "[n]othing in the 40 Years Report … requires that a CRA, before providing a report to an entity, verify that the entity has a license," and that Plaintiffs "misapprehend the import" of language in the report relating to checking government licensing. (Def.'s Ex. M, Dkt. # 128-14, at ¶¶ 22-26.) With regard to the consent decree, Winston opines that the procedures

required in that decree were not intended to apply to all credit reporting agencies but were rather "fencing-in relief" only intended to apply to the particular party subject to the decree. (*Id.* at ¶¶ 28-29.) Clarity argues that this testimony is proper because Winston was working at the FTC at the time that both the staff report and the ChoicePoint consent decree were produced, and therefore has unique insight into the agency's intentions in drafting those documents.[4]

Such insights do not render his testimony admissible, however, because "[c]onsent decrees are fundamentally contracts." *People Who Care v. Rockford Bd. of Educ. Sch. Dist. No. 205*, 961 F.2d 1335, 1337 (7th Cir. 1992). It is well settled in this circuit that experts may not ordinarily be called to explain what a contract means. *See RLJCS Enters., Inc. v. Prof'l Benefit Trust Multiple Employer Welfare Benefit Plan & Trust,* 487 F.3d 494, 498 (7th Cir. 2007) (explaining that "[a]rgument about the meaning of ... contracts ... belongs in briefs, not in expert's reports"); *Loeb v. Hammond*, 407 F.2d 779, 781 (7th Cir. 1969) ("The question of interpretation of the contract is for the jury and the question of legal effect is for the judge. In neither case do we permit expert testimony."); *see also Scottsdale Ins. Co. v. City of Waukegan*, 689 F. Supp. 2d 1018, 1023 (N.D. Ill. 2010) (striking expert testimony that explained how some portions of a contract modified other parts, because such testimony "usurps the Court's role in interpreting the language" of the contracts). Similar prohibitions have been applied to the rare circumstance in which a judge is called as an expert to explain the meaning of a court order. *See United States v. Zipkin*, 729 F.2d 384, 389 (6th Cir. 1984) (holding that it was reversible error to call a bankruptcy judge as a witness to testify that an order imposed certain obligations). As noted above, the interpretation of statutes and regulations is also off-limits for experts because it

---

[4] Clarity also insists that these statements are not "matters of law" but "statements of fact based on [Winston's] own personal knowledge supervising the ChoicePoint case and negotiating the ChoicePoint consent decree." (Def.'s Mem. Opp'n Mot. Strike, Dkt. # 155, at 5) (emphasis in original.) The intended legal significance of the terms of a document may qualify as a fact in the most literal sense of the word. But where – as here – such intent is offered only to suggest the way in which terms should be interpreted, it is indistinguishable from legal opinion regarding how courts ought to interpret a legal document.

is the province of the judge to determine the law. *See Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 900 (7th Cir. 1994) ("The meaning of federal regulations is not a question of fact, to be resolved by the jury after a battle of experts. It is a question of law, to be resolved by the court"). While the FTC staff report may not technically be a contract, judicial opinion, or regulation, the same principle applies: a document establishing legal standards "should speak for itself and not be varied by parol testimony as to what was meant by its provisions." *Zipkin*, 729 F.2d at 389.

Accordingly, none of the testimony offered in Winston's declaration is admissible under Rule 702. Winston's declaration is therefore stricken in its entirety and the Court does not consider it in ruling on the instant summary judgment motion.

*Clarity's Motion to Strike Expert Testimony*

Clarity moves to strike the expert testimony of Margot Saunders for largely the same reasons Plaintiffs seek to strike the testimony of Winston.[5] Saunders' testimony does indeed suffer from the same infirmities as does Winston's testimony, namely that it consists largely of legal conclusions – though unlike Winston, Saunders at least attempted to repackage her legal conclusions in what Clarity quite aptly describes as "pseudo-deferential" language. (*See, e.g*., Pls.' Ex. A, Dkt. # 145-1, at 7) ("It is for the court to determine whether facilitating identity theft is a permissible purpose."); (*Id*. at 31) (offering that the Supreme Court, "if asked, would find tribes subject to state licensing laws.") Plaintiffs, seemingly recognizing that their vigorous attack on Clarity's expert is equally applicable to their own, attempt to salvage the report by insisting that their response to the summary judgment motions relies only on those portions of

---

[5] Clarity also gives the additional reason that Saunders' testimony was presented in the form of a draft report and was unsworn in violation of Rule 56. Plaintiffs have responded to the latter contention by filing a new, sworn version of Saunders' testimony, and the Court is satisfied that this resolves the technicality Clarity complains of.

Saunders' testimony that describe problems with the payday lending industry generally and Clarity's role in it. (Pls.' Mem. Opp'n Mot. Strike, Dkt. # 170, at 4-5.) Clarity contends that even this limited portion of the testimony should be stricken because it is irrelevant and because Saunders is not qualified to give it.

It is ultimately unnecessary to resolve these issues because the Court finds that even if Saunders' testimony is considered in its entirety, Plaintiffs have failed to show a triable issue of material fact sufficient to survive a motion for summary judgment, as explained below. Clarity's motion to strike Saunders' testimony is therefore stricken as moot.

SUMMARY JUDGMENT MERITS

Plaintiffs' complaint alleges that Clarity is liable for actual, statutory, and punitive damages under the FCRA on the grounds that Clarity (1) willfully furnished Plaintiffs' credit reports to the Named Lenders without "any permissible purpose for doing so," and (2) failed to properly screen the customers to which it provided reports, thereby providing reports to "numerous illegal entities."[6]

Under the FCRA, a consumer credit reporting agency is permitted to furnish a consumer's credit report to a third party only under enumerated circumstances. As relevant here, a credit reporting agency may furnish a credit report to "a person which it has reason to believe" intends to use the information for a "permissible purpose," including "to use the information in

---

[6] Plaintiffs also raise a different issue, arguing that Clarity failed to comply with a section of the FCRA applicable only to *resellers* of credit reports, 15 U.S.C. § 1681e(e)(2). This portion of the statute imposes liability on a reseller who fails to adequately identify the end-user (rather than the direct customer) of credit reports it sells. This claim appears nowhere in any version of Plaintiffs' complaint, however, and is mentioned for the first time as an alternate source of liability in Plaintiff's response to the summary judgment motion. A plaintiff is not permitted to "amend his complaint through arguments in his brief in opposition to a motion for summary judgment" by raising issues there for the first time. *See Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004); *Shanahan v. City of Chi.*, 82 F.3d 776, 781 (7th Cir. 1996). The Court therefore ignores these allegations and does not consider 15 U.S.C. § 1681e(e)(2) as a possible basis of liability for purposes of summary judgment.

connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer." 15 U.S.C.A. § 1681b(3). The statute also requires agencies to "maintain reasonable procedures" to ensure that reports are disclosed only for permissible purposes, including requiring prospective users to identify themselves and certify that a report is sought only for permissible purposes, and to make "reasonable efforts" to verify prospective users' identities and purported uses before giving them a report. 15 U.S.C. § 1681e(a).

A negligent violation of any provision of the FCRA entitles the victimized consumer to recover "any actual damages sustained by the consumer as a result of the failure" plus reasonable attorney's fees. 15 U.S.C. § 1681o(a)(1). If, however, the credit reporting agency's violation of the statute was willful, the consumer can instead recover statutory damages of "not less than $100 and not more than $1,000" and may also be entitled to punitive damages and attorney's fees. 15 U.S.C. § 1681n(a). Liability for willful infringement extends both to acts known to violate the FCRA and acts done in reckless disregard of statutory duties. *See Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 57 (2007).

Analyzing the reasonableness of Clarity's lender-vetting procedures is unnecessary because Plaintiffs have failed to show any entitlement to damages. *See Ruffin-Thompkins v. Experian Info. Solutions, Inc*., 422 F.3d 603, 608 (7th Cir. 2005) ("Before any discussion of the reasonableness of the reinvestigation is necessary, however, Ruffin–Thompkins must show that she suffered damages as a result of the inaccurate information.") (quotation marks omitted); *Sarver v. Experian Info. Solutions*, 390 F.3d 969, 971 (7th Cir. 2004) (affirming grant of summary judgment on grounds that the plaintiff had failed to show evidence of any damages). Because Plaintiffs have failed to show any causal link between Clarity's conduct and the actual

damages they allege that they suffered, they cannot maintain a suit for negligent violation of the FCRA. Because they have offered no evidence from which a jury could reasonably conclude that Clarity's conduct was willful, they are also not entitled to punitive or statutory damages. Accordingly, no remedy is available to Plaintiffs and summary judgment in Clarity's favor is appropriate.

*Actual damages*

Plaintiffs allege that they have suffered actual damages in the form of emotional distress, headaches, weight loss, loss of sleep, and time and money expended in efforts to protect their identities. Damages are not presumed in an FCRA case, and a plaintiff bears the burden of showing "a causal relation between the violation of the statute and the loss of credit, or some other harm." *Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 664 (7th Cir. 2001). Damages for emotional distress are particularly scrutinized. *See Sarver*, 390 F.3d at 971 (noting that in FCRA cases, the Seventh Circuit has "maintained a strict standard for a finding of emotional damage because they are so easy to manufacture").

Even assuming that Plaintiffs' description of their emotional distress satisfies this circuit's strict standard for finding such damages, Plaintiffs have wholly failed to show any causal connection between Clarity's conduct and the damages they allege. Both Plaintiffs admitted in their Request for Admission responses that they have "no direct evidence of a connection" between the phone calls they received and Clarity's verification of their information to lenders, and they only "believe" the two are related because of their temporal proximity. (Ex. J, ¶ 14, Ex. K, ¶ 14.) Even drawing all reasonable inferences in favor of Plaintiffs as the non-moving party, the record reflects no plausible connection between Clarity's provision of its Clear

ID Fraud service and the collection calls to Plaintiffs. *See Lee v. Experian Info. Solutions*, No. 02 C 8424, 2003 WL 22287351, at *5 (N.D. Ill. Oct. 2, 2003) ("While to be sure all reasonable inferences must be drawn in [the plaintiff's] favor, it is appropriate here to resolve the causation issue at the summary judgment stage because no reasonable jury could conceivably find that a causal connection exists between the alleged statutory violation and any ensuing damages").

Plaintiffs do not know who the calls came from.[7] As most of the Named Lenders declined to make any loans to the applicants using Plaintiffs' names, there has been no connection shown between the calls and the Named Lenders – much less between the calls and Clarity. More importantly, the record is clear that the Named lenders already *had* all the sensitive personal information of the Plaintiffs prior to Clarity having become involved in any way; all Clarity provided was "verification" of that information and (possibly, though the record is unclear) reason codes with general statements of past credit problems. Plaintiffs have suggested no mechanism by which this "verification" or the reason codes could have enabled lenders to victimize Plaintiffs, particularly given that there is no evidence that whoever filled out loan applications in Plaintiffs' names ever saw the Clarity report.

Instead, the record suggests that by far the most likely explanation is that Plaintiffs were the victims of identity theft prior to any involvement by Clarity. Whoever stole the Plaintiffs' identities seems to have used them to apply for multiple loans online in quick succession, and the online lenders sent the application information to Clarity to verify. Far from abetting or furthering the identity theft, Clarity investigated the applications and in fact replied to the Named Lenders that the applications showed signs of a high risk of fraud. If anything, Clarity's provision of the Clear ID Fraud service *mitigated* any harm to Plaintiffs by dissuading all but two

---

[7] In fact, Schaller's notes on his credit report indicate that he believed an entity called Speedy Cash was the offending party. It is undisputed that Clarity did not provide Schaller's credit report to Speedy Cash, which is not among the Named Lenders at issue here.

of the Named Lenders from making loans to identity thieves in Plaintiffs' names. Plaintiffs' purported reason for laying blame at Clarity's door – suspicious timing between Clarity's provision of the Clear ID Fraud service and the collection calls – does not show a causal connection, given the strong possibility that both followed identity thieves applying for fraudulent loans in Plaintiffs' names.

The Seventh Circuit's analysis in *Ruffin-Thompkins v. Experian Info. Solutions, Inc*., 422 F.3d 603 (7th Cir. 2005) is instructive. In *Ruffkin-Thompkins*, a consumer filed suit against a credit reporting agency, claiming that the agency's failure to promptly investigate her objections to information on her credit report harmed her by causing banks to deny credit. *Id*. at 606-07. The district court granted summary judgment and the Seventh Circuit affirmed, noting that the only denials of credit in the record occurred prior to the plaintiff's complaint about information on her credit report. *Id*. at 609. The court therefore concluded that "even if [the plaintiff] could prove that Experian violated a duty it owed to her under the FCRA, she cannot establish 'a causal relation between the violation of the statute and the loss of credit'" and had therefore failed to establish any damages. *Id*. at 610. Similarly here, even if Clarity's provision of its Clear ID Fraud service to the Named Lenders constituted a negligent violation of the FCRA, there are no facts in the record from which a jury could conclude that this violation bore a causal relationship to any harm of which Plaintiffs complain.

That some loans were fraudulently taken out in Plaintiffs' names and they received collection calls as a result is certainly unfortunate. Plaintiffs have been victimized and understandably seek restitution, but the proper target of their ire is the identity thieves who took out fraudulent loans in their names or, perhaps, the two Named Lenders who made such loans despite warnings by Clarity that the applications were likely fraudulent. Clarity, who comes into

the picture two steps removed from Plaintiffs' victimization and did nothing to further it, is not liable for Plaintiffs' actual damages and is therefore entitled to summary judgment on Plaintiffs' negligence claims.

*Statutory and punitive damages*

Because Plaintiffs have failed to show any causal connection between their actual damages and Clarity's conduct, their claims can survive only if they are entitled to punitive or statutory damages. As noted above, punitive and statutory damages are only available under the FCRA where a defendant's violation of the statute was willful. To demonstrate willful noncompliance with the FCRA, Plaintiffs must show that Clarity's alleged violation of the statute was either knowing or done in "reckless disregard of statutory duty." S*afeco Ins. Co.*, 551 U.S. at 56-57. Reckless disregard of statutory duty means not only that the offender's conduct was "a violation under a reasonable reading of the statute's terms," but that "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id*. at 69. Accordingly, "only a reading [of the FCRA] that is objectively unreasonable can be deemed a willful violation." *Van Straaten v. Shell Oil Prods. Co. LLC*, 678 F.3d 486, 489 (7th Cir. 2012) (quotation marks omitted).

Plaintiffs insist that Clarity's verification of their personal information to the Named Lenders constituted a willful violation of the FCRA because "Clarity's conduct in providing reports to a long list of criminal enterprises, at least three of whom had been the subject of government enforcement actions" shows reckless disregard of its statutory duty to ensure credit reports are used for a permissible purpose. (Pl.'s Memo. Opp'n Summ. J., Dkt. # 145, at 26.) In support of this argument, Plaintiffs point to: (1) evidence that some of the Named Lenders were

subject to enforcement actions in various states; (2) evidence that some of the Named Lenders were not licensed to make high-interest loans in Illinois; and (3) assertions that Clarity's president and founding investors were familiar with the payday lending industry, coupled with expert testimony as to alleged legal and ethical problems with payday lending generally. (*Id*. at 27.)

None of this evidence is sufficient to create an issue of material fact as to willfulness. That some of the Named Lenders were targeted by state enforcement agencies or were banned from lending in particular states does not render Clarity's decision to do business with them in this case a violation of the FCRA, much less a willful one. The evidence is essentially unrebutted that Clarity provided the Clear ID Fraud service to actual lending institutions in connection with actual loan applications, and this is an explicitly enumerated permissible purpose under the statute. Accepting Plaintiffs' argument would mean that credit reporting agencies must instantly cease doing business with any lender as soon as that lender runs afoul of regulators in any state[8]; to do otherwise is, in Plaintiffs' view, not only a violation of the FCRA but a willful one. Such a burden goes far beyond the reasonable steps to certify a permissible purpose that the FCRA actually requires, and Clarity's conclusion that such action was not statutorily required was not "objectively unreasonable" such that a finding of willfulness would be appropriate.

Similarly, Plaintiffs' allegation that none of the Named Lenders possessed a license from the Illinois Department of Financial and Professional Regulation, Division of Financial Institutions is a red herring. (Pls.' Stmt. Add'l Facts, Dkt. # 146, ¶ 5.) Illinois requires such a license only for making certain types of loans with interest rates of over 9%. 815 ILCS 205/4. Plaintiffs have not shown that the loan applications in question here concerned loans in excess of

---

[8] Tellingly, none of the state enforcement actions against Named Lenders identified by Plaintiffs involved Illinois regulators. As both Plaintiffs are Illinois residents, it is unclear why Plaintiffs believe Clarity would or should have checked for enforcement actions against the Named Lenders in any other jurisdiction.

9% or otherwise violated Illinois usury laws. Because there is no evidence that the Named Lenders would have required a license to make the loans involved in this case, the fact that none of them had such a license does not make Clarity's decision to furnish them with its Clear ID Fraud service a willful violation of any duty under the FCRA.

Finally, Plaintiffs' assault on the integrity of the "payday lending" industry generally is irrelevant here. Plaintiffs have offered no authority to suggest that payday loans are not a "permissible purpose" for which a reporting agency can provide a credit report under the FCRA; providing consumer credit reports in connection with a loan application is unquestionably a permissible purpose, and nothing in the FCRA carves out an exception for short-term, high-interest, or online loans. That Plaintiffs and their expert believe online payday lending is abusive or unethical does not impose a legal duty on Clarity to avoid doing business with payday lenders.

Accordingly, it was not objectively unreasonable for Clarity to verify Plaintiffs' information to the Named Lenders in connection with the loans in question here, as there is nothing in the record from which a jury could conclude that the loans in question were not a permissible purpose for furnishing a credit report under the FCRA.[9]

---

[9] Plaintiffs make much of the fact that "payday lending," as they define it, is illegal or requires a license in a handful of states. (Pls.' Stmt. Add'l Facts, Dkt. # 146, ¶ 2.) They do not suggest, however, that such lending is illegal in Illinois – the state in which both Plaintiffs reside – or in the states in which any of the Named Lenders are incorporated.

**Conclusion**

For the reasons set forth above, Clarity's motion for summary judgment [130] is granted. Plaintiff's motion to strike the expert testimony of Joel Winston [140] is granted, and Clarity's motion to strike the expert testimony of Margot Saunders [152] is stricken as moot. Clarity's motion to strike Plaintiff's statement of additional facts [156] is denied. Civil case terminated.

**Date**: July 8, 2015

_____
**Ronald A. Guzmán**
**United States District Judge**